IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA THOMPSON, | ) | CASE NO. 1:17-cv-00288 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lisa Thompson ("Plaintiff" or "Thompson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits. Doc. 1. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14. For the reasons explained below, the

Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On September 15, 2014, Thompson protectively filed an application for Disability

Insurance Benefits ("DIB").[1] Tr. 17, 44, 98, 147-153. Thompson alleged a disability onset date

of March 10, 2012. Tr. 17, 44, 88, 100. She alleged disability due to back injury, depression,

obesity, hyperlipidemia, and ischemic heart disease. Tr. 44, 88, 99, 110, 117, 171. Thompson's

application was denied initially (Tr. 110-113) and upon reconsideration by the state agency (Tr.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application." http://www.socialsecurity.gov/agency/glossary/ (last visited 12/27/2017).

117-123).   Thereafter, she requested an administrative hearing.  Tr. 124-125.  On August 31,

2016, Administrative Law Judge Pamela Loesel ("ALJ") conducted an administrative hearing.

Tr. 40-87.

In her October 17, 2016, decision (Tr. 14-39), the ALJ determined that Thompson had

not been under a disability within the meaning of the Social Security Act from March 10, 2012,

through the date of the decision (Tr. 17, 35).  Thompson requested review of the ALJ's decision

by the Appeals Council.  Tr. 12-13.  On December 12, 2016, the Appeals Council denied

Thompson's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-4.

## II. Evidence

### A.    Personal, vocational and educational evidence

Thompson was born in 1973.  Tr. 34, 147.  At the time of the hearing, Thompson was 43

years old and was living with her 11 year old daughter and her brother.  Tr. 46, 48, 50.

Thompson's mother had recently passed away and they were living in her mother's house.  Tr.

50.  Thompson has an adult son who lived nearby her home.  Tr. 50.  Thompson last worked in

2012 performing home healthcare work.  Tr. 56-58, 171.  Her home healthcare work involved

lifting and transferring patients and assisting them with range of motion exercises.  Tr. 56-58.

She stopped working because her back pain made it hard for her to perform her duties.  Tr. 171.

Thompson's past work also included hospice and skilled nursing facility work.  Tr. 59-60.

Thompson completed school through the 11th grade.  Tr. 172.  She has been working on

obtaining her GED.  Tr. 68.  She received some vocational training through Vocational Guidance

Services for clerical work.  Tr. 67, 172.  She also tried taking classes at Bryant and Stratton for

paralegal work but she was unable to complete the classes because she was ashamed to admit that she needed some help.  Tr. 66-67.

**B.      Medical evidence**

**1.      Treatment history**

**a.   Physical impairments**

On February 8, 2013, Thompson was seen by Anita Singh, M.D., at Metro Health Brooklyn Health Center with complaints of back pain for a week.  Tr. 319-321.  Thompson also requested an increase in her prescription for Elavil (Amitriptyline) because her then current dosage was not helping with her insomnia.  Tr. 320.  Thompson described her back pain as sharp, excruciating, chronic and radiating into her right buttock and right upper thigh.  Tr. 320.  She did not have weakness or sensory changes but her pain was made worse by forward flexion, lateral flexion, rotation, sitting and standing.  Tr. 320.  Thompson felt that her pain was caused by overuse of her back muscles and exacerbation of a prior back injury from 2005 that occurred when she was lifting a patient.  Tr. 320.  Thompson had gotten "fair relief" with use of NSAIDs, Tramadol, a heating pad and bed rest.  Tr. 320.  On examination, Thompson exhibited tenderness at the L4-L5 area and in her right paraspinal muscles and straight leg raising was negative.  Tr. 320.  Thompson was diagnosed with lumbago and sleep disturbance.  Tr. 321.  She received a Toradol injection and her Elavil was increased.  Tr. 320-321.  Thompson also had an x-ray of her lumbar spine taken in February 2013.  Tr. 300.  The x-ray showed that Thompson's alignment was intact with no acute bony abnormalities and mild to moderate degenerative disc disease at the L4-5 and L5-S1 level.  Tr. 300.

Upon Dr. Singh's referral, on September 23, 2013, Thompson saw Shu Que Huang, M.D., of the Department of Physical Medicine and Rehabilitation ("PM&R").[2]  Tr. 300-303.  Dr. Huang recapped Thompson's reports of her past and present back problems, noting that Thompson indicated that beginning in 2005 she started experiencing intermittent low back pain along with right leg pain to the foot; she had some pain free weeks followed by painful weeks; she did not know what triggered her flare ups; she had tried Motrin and Aleve without relief; she was allergic to opioids; she tried physical therapy and chiropractic treatment in 2005 without relief; and she had tried Lyrica and Cymbalta back in 2005 but had to stop because the medicine made her feel "out of it."  Tr. 300.  Thompson also indicated that she recently started having some soreness in her neck but noted that she had recently started computer classes and, thus, her neck stiffness might be attributed to spending prolonged time stooped at a computer.  Tr. 300.  On examination, Dr. Huang observed 1+ reflexes in Thompson's bilateral extremities; normal sensation in dermatomes of upper and lower extremities; and 5/5 strength in upper and lower extremities.  Tr. 302.  On examination of Thompson's neck, Dr. Huang observed that Thompson's cervical lordotic curvature was decreased in her neck; her range of motion was mildly limited with pain in rotation; she had tenderness bilaterally in her "cervical paraspinals and traps[;]" and Spurling's was negative.  Tr. 302.  On examination of Thompson's back, Dr. Huang observed that Thompson's lumbar lordotic curvature was increased; there was no evidence of scoliosis; flexion and extension range of motion was normal but with pain more-so with extension and lateral bending; there was tenderness at the bilateral lumbosacral paraspinals; there was no evidence of spasm or trigger points; straight leg raise caused low back pain; and FABER caused low back pain.  Tr. 302.  Dr. Huang's assessment was that Thompson had

[2] Resident Jahan Hashem participated in the evaluation.  Tr. 302-303.

chronic spondylogenic low back pain with nerve irritation, noting that her pain may be discogenic in nature and that her neck pain was likely myofascial in nature from computer work. Tr. 302. Dr. Huang referred Thompson to physical therapy for core strengthening and a TENs unit trial; discontinued Motrin and started Thompson on Voltaren and Neurontin; provided her with information on neck stretches; and advised her to return in two months. Tr. 302.

On October 2, 2013, Thompson started physical therapy. Tr. 293-298. Thompson's physical examination findings were generally normal with some abnormal findings noted, including increased lumbar lordosis, poor abdominal strength, and tenderness to palpation in the lumbosacral area. Tr. 297. The physical therapist noted an Oswestry score of 41/50 80%-100%, meaning that she was either bed bound or exaggerating her symptoms. Tr. 297. During an October 7, 2013, physical therapy session, Thompson had no pain. Tr. 291. The physical therapist added lower extremity stretches and practiced flexion exercises. Tr. 291. Thompson tolerated treatment well. Tr. 291. The physical therapist recommended a continued need for physical therapy.[3] Tr. 292.

On February 4, 2014, Thompson was seen at an express care clinic with complaints of low back pain that was worse than usual. Tr. 282-285. Thompson relayed that her back pain was traveling up her back and causing neck pain. Tr. 282. Thompson described her pain as achy and sharp. Tr. 282. Thompson was out of her usual medications and had not tried anything for pain relief. Tr. 282. Positional changes did provide Thompson with pain relief and she had less pain when standing. Tr. 282. On examination, Thompson was in no acute distress but appeared uncomfortable; she exhibited full range of neck motion but with spasm on the right side; there was no visible deformity in her back; she had no midline tenderness in her back; she was

---

[3] Although there was a recommendation for additional physical therapy sessions, there is a lack of further physical therapy records during this period in the administrative record.

negative for palpable spasm in her back; her gait was normal; her ankle reflexes were 2+ bilaterally; her lower leg sensation was intact; her strength was intact 5/5 in her upper and lower extremities. Tr. 284. Thompson received a Toradol injection and new prescriptions. Tr. 284-285. She was advised to follow up with her primary care physician if her symptoms persisted. Tr. 285.

On March 14, 2014, Thompson saw Dr. Singh at Metro Health Brooklyn Health Center for an evaluation of hyperlipidemia. Tr. 274-278. During the visit, Thompson also requested a referral to the pain clinic for her chronic back pain. Tr. 275. She indicated that she tried physical therapy without much relief. Tr. 275. She reported that Neurontin was helping with her pain. Tr. 275. Also, Thompson relayed that she was trying to lose weight and exercise. Tr. 275. On examination, Thompson exhibited bilateral lumbar paraspinal tenderness. Tr. 276. There were no abnormal neurological findings and Thompson's straight leg raising was negative. Tr. 276. Thompson was provided a prescription for Mevacor and advised to follow a low fat, low cholesterol diet and engage in regular, aerobic exercise. Tr. 277. A pain clinic service request was made. Tr. 277.

Upon Dr. Singh's referral, on April 1, 2014, Thompson saw Kutaiba Tabbaa, M.D.,[4] a pain management physician. Tr. 259-266. Thompson explained that physical therapy seemed to help but the pain was too unbearable. Tr. 260. Thompson reported that she took Neurontin, Voltaren, and Elavil and the medication seemed to help but she did not want to take too many pills. Tr. 260. Dr. Tabbaa's cervical exam showed no pain with flexion, extension, or rotation and the cervical paravertebral exam was normal. Tr. 264. Dr. Tabbaa's lumbar exam showed no pain with flexion but extension and rotation were mildly painful. Tr. 264. The cervical

---

[4] Dr. Jay Vyas, M.D., also participated the pain management visit. Tr. 264.

paravertebral exam revealed tenderness on the right to palpation. Tr. 264. Dr. Tabbaa's neurological examination revealed normal reflexes, sensation, strength, coordination and gait. Tr. 264. In addition to his physical examination, Dr. Tabbaa reviewed the February 2013 lumbar x-ray findings. Tr. 264. Dr. Tabbaa concluded that Thompson's symptoms appeared consistent with facet joint arthritis. Tr. 264. Dr. Tabbaa encouraged weight loss, provided Thompson with a prescription for pool therapy, scheduled Thompson for medial branch blocks at L4-L5 and L5-S1, and he advised Thompson to continue taking Voltaren for arthritis/pain relief. Tr. 264. Dr. Tabbaa also prescribed Lorazepan (Ativan). Tr. 265.

On April 17, 2014, Thompson received her first lumbar medial branch block on the right at L3, L4, L5, and S1. Tr. 257. During a follow-up visit with Dr. Tabbaa on May 20, 2014, Thompson reported that she felt great following the lumbar block but had gradually worsening lumbar and hip pain. Tr. 257. Thompson described her pain as sharp, crampy, and intermittent and made worse by rotation and standing. Tr. 257. On examination, Dr. Tabbaa observed normal strength in all extremities, normal deep tendon reflexes, and normal sensation in all extremities. Tr. 257. Dr. Tabbaa observed some positive findings, including limitation of motion on extension and marked tenderness to palpation over the paraspinal muscles. Tr. 257. Dr. Tabbaa reminded Thompson of the importance of protecting her back and maintaining a regular program of improving strength and flexibility. Tr. 258. Dr. Tabbaa recommended bilateral L4-5 and L5-S1 facet injections and physical therapy. Tr. 258. He prescribed Zanaflex. Tr. 258.

On June 18, 2014, Thompson was seen at an express care facility complaining of problems with her back. Tr. 249-252. Her symptoms included left flank pain. Tr. 250. Thompson's general appearance on examination was noted to as "healthy, alert, mild distress,

oriented." Tr. 250. A musculoskeletal examination revealed a full range of motion; a steady gait; and tenderness over the sacral spine with muscular pain over the left and right flank area. Tr. 250. Thompson was prescribed Voltaren and Lidocaine and she was advised to contact pain management to request an earlier appointment for her injection. Tr. 250. She was also advised to seek relief through pillow positioning and heat therapy. Tr. 250.

On September 16, 2014, Thompson saw Dr. Tabbaa for follow up. Tr. 246-249. Thompson had a facet joint injection on June 24, 2014, which she reported alleviated her pain for about a month. Tr. 246. She continued to have gradually worsening lumbar pain that she described as constant and throbbing and worse with forward flexion, cold weather and generally all activity. Tr. 246. Thompson also complained of numbness in her right leg. Tr. 246. She felt that the Volteran, Motrin and Lidocaine were not working to relieve her pain. Tr. 246. Thompson explained that she had several allergies to pain medication. Tr. 246. On physical examination, Dr. Tabbaa observed that Thompson was in no distress; she had no abnormal curvature in her back; range of motion in her back was normal; she had normal strength in all extremities; deep tendon reflexes were normal and sensation was normal in all extremities; there was tenderness to palpation over the paraspinal muscles. Tr. 247. Dr. Tabbaa reinforced the importance of protecting her back and maintaining a regular program of improving her strength and flexibility; he recommended pool therapy; and recommended bilateral medial branch blocks at the L3-S1. Tr. 248.

On November 6, 2014, Thompson received her second bilateral L3, L4, L5 and S1 lumbar medial branch block. Tr. 348-351, 368. During a February 3, 2015, follow-up visit with Dr. Tabbaa, Thompson reported getting good relief from the medial branch block for two weeks. Tr. 343, 362. On physical examination, Dr. Tabbaa observed bilateral paraspinal tenderness in

the lumbar region.  Tr. 344, 362.  Dr. Tabbaa prescribed Zanaflex and he recommended radiofrequency ablation.  Tr. 346.  Dr. Tabbaa also recommended a weight management referral, noting he discussed with Thompson the importance of pool therapy and weight loss.[5]  Tr. 346, 365.  Thompson underwent the lumbar medial branch radiofrequency rhizotomy at the L3, L4, L5, and S1 areas on the right on March 30, 2015, and on the left on April 9, 2015.  Tr. 352-353, 355-356.

On May 24, 2015, Thompson was seen at the emergency room.  Tr. 427-439.  She complained of low back pain that was radiating into her legs bilaterally.  Tr. 427, 429.  Thompson relayed that her back problem was chronic but she woke up that morning and her pain was worse.  Tr. 427.  On physical examination, the following was observed – Thompson could move all four extremities and there was no midline thoracic spine tenderness but there was diffuse lumbar tenderness; straight leg raise was negative bilaterally; Thompson had 5/5 strength bilaterally in her lower extremities upon knee flexion/extension, ankle dorsiflexion, and ankle plantar flexion; Thompson had no sensory deficits to light tough; her reflexes were normal and equal; she had a normal gait; and there were no acute focal neurological deficits.  Tr. 431.  Thompson was treated in the emergency room with a Toradol injection and Flexeril tablet.  Tr. 431.  She showed improvement following administration of the medication and was discharged in stable condition.  Tr. 431-432.  On discharge, Thompson was provided with prescriptions for Naproxen and Zanaflex.  Tr. 432.

Two days later, on May 26, 2015, Thompson saw Dr. Tabbaa for a follow-up visit.  Tr. 423-426.  On examination, Dr. Tabbaa observed normal range of motion in Thompson's back; normal strength in all extremities; normal deep tendon reflexes and normal sensation in all

---

[5] Dr. Tabbaa noted that Thompson was drinking a 2L bottle of Pepsi per day.  Tr. 347.

extremities; and tenderness to palpation over Thompson's paraspinal muscles. Tr. 425. Dr. Tabbaa noted that Thompson was experiencing the same pain she had been having despite undergoing a radio frequency procedure. Tr. 425. He recommended a lumbar MRI for radicular right leg pain. Tr. 425. He also recommended physical therapy and a consultation for a disability assessment, noting that Thompson was applying for disability. Tr. 425. On June 11, 2015, the lumbar MRI was performed. Tr. 442. The results showed mild degenerative changes with posterior disc bulging at L3-4, L4-5, and L5-S1 along with facet hypertrophy and bilateral foraminal impingement most evident at L5-S1. Tr. 442. There was no disc extrusion or critical canal stenosis. Tr. 442.

On June 17, 2015, Thompson saw Marline Sangnil, M.D., and Mary Vargo, M.D., of the PM&R department.[6] Tr. 416-420. Drs. Sangnil and Vargo took a history regarding Thompson's back problems, considered the June 11, 2015, MRI findings, and performed a physical examination. Tr. 416-420. Findings from the back examination included a normal lumbar lordotic curvature; no evidence of scoliosis; very limited range of motion (flexion 20 degrees, extension 0, lateral rotation 0 bilaterally); tenderness throughout the lumbar spine paraspinals and midline; and straight leg lifting in both legs caused pain at 10 degrees. Tr. 419. The neurological motor examination was limited in some respects due to pain. Tr. 419. Thompson's sensation was intact to light touch in her upper and lower extremities bilaterally. Tr. 419. Thompson's reflexes were normal throughout her upper and lower extremities. Tr. 419. With respect to Thompson's gait, Drs. Sangnil and Vargo observed that Thompson was only able to take three steps and then had to sit down. Tr. 419. Also, they observed that Thompson was only able to lift five pounds for about three minutes before sitting down. Tr. 419. Dr. Vargo noted

---

[6] Dr. Sangnil was the resident physician and Dr. Vargo was the attending physician. Tr. 420.

that Thompson's reactions to pain seemed to have become exaggerated.  Tr. 420.  Also, Dr. Vargo observed that Thompson had had limited physical therapy and had not had a "psychology approach for pain management coping strategies[.]"  Tr. 420.  Drs. Sangnil and Vargo indicated that imaging revealed lumbar degenerative changes with mild bilateral neural foraminal impingement most evident at L5-S1 and noted that the examination was limited due to pain.  Tr. 420.  They advised Thompson to fax the disability paperwork to their office, follow up with pain management, and they recommended that she see a psychologist and physical therapist.  Tr. 420.

Thompson sought treatment at an express care clinic on October 4, 2015, for her back pain.  Tr. 403-404.  Thompson indicated that her pain was not any different that day than it had been.  Tr. 404.  She was seeking documentation regarding her history of back pain.  Tr. 404.  The express care clinic advised Thompson that she would need to see her primary care physician regarding her request and that the next open appointment was on October 7, 2015.  Tr. 404.  Instead of waiting to be seen in the express care clinic, Thompson opted to see her primary care physician on October 7, 2015.  Tr. 400-403, 404.   During her October 7, 2015, visit with Dr. Singh, Thompson complained that her back pain was not improving and was getting progressively worse.  Tr. 401.  She reported pain radiating into her legs bilaterally and that she had fallen a couple of times.  Tr. 401.  Physical examination findings were normal.  Tr. 402.  The diagnosis was spondylosis of lumbosacral joint.  Tr. 402. The recommended plan was for Thompson to follow up with the PM&R department.  Tr. 402.

On November 18, 2015, Thompson saw Drs. Sangnil and Vargo again for a disability evaluation.  Tr. 391-396.  She presented with her disability forms.  Tr. 391.  An updated evaluation was performed by Drs. Sangnil and Vargo because they felt their prior evaluation "was a relatively long time ago (6/17/15)[.]"  Tr. 395.  Thompson relayed she was unable to

work due to her back pain, which she described as starting in her low back and radiating down the back of her legs to her feet and causing difficulty with ambulation. Tr. 391. Thompson reported that sitting and standing for more than 20 minutes causes pain. Tr. 391. She reported numbness/tingling in her lower extremities and weakness in her extremities. Tr. 391. Findings from the back examination included a normal lumbar lordotic curvature; no evidence of scoliosis; limited range of motion (flexion 30 degrees, extension 0, lateral rotation 0 bilaterally); tenderness throughout the lumbar spine paraspinals and midline; and straight leg lifting in both legs caused low back pain. Tr. 394. Thompson's FABER's and Gaenslen's testing was positive. Tr. 394, 395. The neurological motor, sensory and reflex examination of upper and lower extremities was normal. Tr. 394. Thompson's gait was slow and antalgic. Tr. 394. Drs. Sangnil and Vargo indicated that imaging revealed lumbar degenerative changes with mild bilateral neural foraminal impingement most evident at L5-S1 and that the examination revealed bilateral sacroiliac joint pain, which could be factoring into Thompson's back pain. Tr. 394. Dr. Sangnil completed Thompson's disability forms that day.[7] Tr. 395. Thompson was advised to continue to follow up with pain management and that consideration should be given to sacroiliac joint injections. Tr. 395.

### b. Mental impairments

On April 23, 2012, Thompson was seen at Metro Health Brooklyn Health Center with complaints of insomnia, being under a lot of stress, and elevated blood pressure. Tr. 328. Thompson reported losing her job and trying to get back into school. Tr. 328. She had tried Ambien and Elavil with some success. Tr. 328. Thompson was provided a prescription for Elavil. Tr. 330. In May 2012, Thompson returned to Metro Health Brooklyn Health Center to

---

[7] Dr. Sangnil's opinion is discussed below in the opinion evidence section.

obtain a physical for a STNA position. Tr. 325. At that time, Thompson denied any other concerns or issues, including psychiatric concerns. Tr. 325.

Starting around October 2012, Thompson began seeing Dr. Griggins, Ph.D., with Parma Health Ministry, for psychological counseling. Tr. 212-234. Thompson reported having anger problems and feeling somewhat depressed. Tr. 233. She indicated she had never been unemployed until recently and was unable to find work. Tr. 234. She was trying to finish her GED and take courses to become an EKG technician. Tr. 234. Thompson was taking Elavil to help her sleep. Tr. 233.

During a February 8, 2013, visit at Metro Health Brooklyn Health Center, Thompson requested and received an increase in her Elavil prescription because she felt that the medication was not helping her with her insomnia. Tr. 320. On June 27, 2013, Thompson saw Dr. Singh again at Metro Health Brooklyn Health Center. Tr. 311-314. Thompson relayed that she was having problems with insomnia, anhedonia, and fatigue and she was feeling hopeless, having excessive guilt, and feeling depressed. Tr. 312. Her symptoms had started about a week earlier and were gradually worsening. Tr. 312. She reported she had "a lot going on – [her] son just went to jail yesterday." Tr. 312. On physical examination, Dr. Singh observed that Thompson's mood was stable and her speech was appropriate. Tr. 313. Thompson was continued on Elavil and advised to take it every day. Tr. 314. Thompson saw Dr. Singh on August 9, 2013, for medication monitoring. Tr. 307. Thompson's insomnia was well controlled with Elavil and she wanted a refill. Tr. 307-308. She denied suicidal and homicidal ideation and her mood was stable. Tr. 308. Dr. Singh continued Thompson on Elavil. Tr. 310.

In September 2013, Thompson saw Dr. Griggins. Tr. 216. Dr. Griggins noted that Thompson was doing very well. Tr. 216. She was receiving computer training services through

VGS; she was in a good relationship with a male friend; and she was distancing herself from her son and involving herself less in his relationships and problems.  Tr. 216.  However, in April 2014, Thompson reported being stressed about having no job and no money.  Tr. 214.  She was concerned she might be evicted from her Section 8 housing.  Tr. 214.  She was more stressed and getting more angry with the people that she needed help from.  Tr. 214.  Dr. Griggins suggested that Thompson start seeing him more regularly again since she was engaging in self-defeating behaviors.  Tr. 214.  Thompson cancelled two appointments with Dr. Griggins in May 2014.  Tr. 213.  In July 2014, Thompson was coping with her father's death and the death of her daughter's 15-year old friend.  Tr. 213.  She also reported that she was not having luck through VGS and was thinking about going back to being a STNA but she could not afford the $500 fee associated with repeating the STNA courses and exam.  Tr. 213.  Dr. Griggins encouraged her to call non-profits to see if training was available at a lower rate since VGS would not cover the costs.  Tr. 213.  Thompson continued to see Dr. Griggins through at least July 2014.  Tr. 213.

On March 17, 2015, Thompson saw Dr. Singh for a follow-up visit.  Tr. 339-342.  Thompson reported she was stressed out due to housing related matters and she was having a difficult time sleeping.  Tr. 339.  She was living with her brother and looking for her own housing and a job.  Tr. 339.  Thompson was interested in increasing her Elavil dose.  Tr. 339.  She reported having a good support system and she denied suicidal and homicidal ideation.  Tr. 339.  On examination, Dr. Singh observed that Thompson was alert, pleasant, cooperative and her mood and affect were stable.  Tr. 341.  Dr. Singh increased Thompson's Elavil dose.  Tr. 342.

On September 22, 2015, Thompson presented to Metro Health for a mental health assessment that was conducted by Jane Martinez, LISW.  Tr. 405-415.  Thompson relayed that

she had been evaluated at Metro for her back pain and was told that there was nothing wrong with her and was advised to see a psychiatrist. Tr. 405. She reported feeling depressed for about 4 years. Tr. 405-406. Approximately three or four years earlier her son was stabbed around Mother's Day. Tr. 406. He survived. Tr. 406. Around that same time, her mother was very ill with COPD and emphysema. Tr. 406. She reported wanting to stay home and not talking with anyone. Tr. 406. Her appetite fluctuates. Tr. 406. Thompson never attempted suicide but reported suicidal ideation. Tr. 406. Thompson's stressors included lack of work and having to support herself and her daughter. Tr. 406. She was evicted in February 2015. Tr. 406. She reported having problems falling asleep and staying asleep. Tr. 406. Thompson also reported problems with irritability, aggression, and anxiety. Tr. 407. Because of her anxiety, Thompson indicated she was unable to concentrate at times. Tr. 407. Ms. Martinez diagnosed dysthymic disorder and cannabis abuse and assessed a GAF score of 51-60.[8] Tr. 411. Ms. Martinez noted that Thompson was scheduled for appointments with Ms. Martinez as well as Carol Cardello. Tr. 411.

On November 30, 2015, Thompson saw Carol Cardello, CNS, for pharmacologic management. Tr. 383-386. Thompson reported depression in the context of chronic pain. Tr. 384. Thompson indicated she had applied for disability. Tr. 384. She had obtained some secretarial training but was unable to find work or sit for long periods of time. Tr. 384. Ms. Cardello noted that Thompson was reluctant to try new medications but was receptive to trying

---

[8] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

an antidepressant. Tr. 385. On examination, Ms. Cardello observed that Thompson was adequately groomed; cooperative; oriented to time, person and place; her speech was spontaneous with a normal rate and flow; she had racing and paranoid thoughts; she had occasional auditory hallucinations – voices that were self-deprecating, not commanding; her mood was depressed and irritable; her affect was full; her memory was within normal limits; her attention and concentration were sustained; and her judgment and insight were fair. Tr. 385. Ms. Cardello felt that Thompson could benefit from antidepressant medication and counseling. Tr. 395. She diagnosed depression due to general medical condition, prescribed Effexor, and recommended that Thompson resume counseling.[9] Tr. 385-386.

On December 16, 2015, Thompson saw Ms. Martinez for counseling. Tr. 376-378. Ms. Martinez noted that Thompson was making progress towards her treatment goals – she was attending appointments; she acknowledged needing professional help; her medication was helping with her hallucinations; and she was looking for a case manager. Tr. 377. On examination, Ms. Martinez observed that Thompson was well groomed; cooperative; oriented to time, person and place; her speech was spontaneous with a normal rate and flow; her thought process was logical and organized; there were no abnormal/psychotic thoughts; her insight and judgment were fair; her memory was within normal limits; her attention and concentration were sustained; her mood was euthymic; and her affect was full. Tr. 378. Ms. Martinez's impression was that Thompson's symptoms were in partial remission. Tr. 378.

On July 8, 2016, Thompson saw Ms. Cardello. Tr. 677-679. Thompson reported doing okay after having lost her mother a few weeks prior. Tr. 678. Thompson was continuing to see a counselor. Tr. 678. Thompson was taking Benadryl to help her sleep and she reported benefits

---

[9] Thompson had to miss and reschedule prior counseling sessions due to transportation issues. Tr. 385.

from taking Effexor.  Tr. 678.  Thompson presented disability paperwork and paperwork to erase a loan.  Tr. 678.  Ms. Cardello advised Thompson that the paperwork would need to be completed at a different visit or outside of the current session.  Tr. 678.  Thompson had needed assistance from mobile crisis for "flipping out" at home.  Tr. 678.  She had been evicted from her home and was living with her brother.  Tr. 678.  Thompson reported feeling more stable and she denied suicidal ideation.  Tr. 678.  Ms. Cardello observed that Thompson's mood was sad and grieving and her thoughts were racing.  Tr. 678.  Other objective physical examination findings were that Thompson was adequately groomed; cooperative; oriented to time, person and place; there were infrequent voices; rate and flow of speech were normal; affect was full; attention and concentration were sustained; memory was within normal limits; and judgment and insight were fair.  Tr. 678.  Ms. Cardello's impression was that Thompson was less anxious but grieving the loss of her mother.  Tr. 679.  Ms. Cardello diagnosed depression due to general medical condition and she recommended that Thompson continue Effexor, use Benadryl for sleep, and continue counseling.  Tr. 679.

## 2. Opinion evidence

### a. Treating

*Physical impairments*

On November 18, 2015, Dr. Sangnil completed a form entitled Medical Source Statement: Patient's Physical Capacity.  Tr. 445-456.  Dr. Sangnil opined that Thompson was restricted to lifting/carrying 5 pounds occasionally and 5 pounds frequently; standing/walking for a total of 5 minutes, noting that Thompson can only take a few steps before she has severe pain; and sitting a total of 25 minutes.  Tr. 445.  In support of exertional limitations, Dr. Sangnil noted that Thompson had lumbar degenerative changes with mild bilateral foraminal impingement

most evident at L5-S1.  Tr. 445.  Dr. Sangnil opined that Thompson could rarely climb, stoop, crouch, kneel and crawl and she could occasionally balance.  Tr. 445.  Dr. Sangnil opined that Thompson could rarely reach or push/pull and she could frequently perform fine and gross manipulation.  Tr. 446.  Dr. Sangnil opined that Thompson's impairments caused environmental limitations, including heights and moving machinery.  Tr. 446.  Dr. Sangnil indicated that Thompson had not been prescribed a cane, walker, brace, TENS unit, breathing machine, oxygen or wheelchair.  Tr. 446.  Dr. Sangnil opined that Thompson would need to alternate between sitting, standing, and walking at will.  Tr. 446.  She rated Thompson's pain as severe and indicated that Thompson's pain would interfere with concentration and cause absenteeism.  Tr. 446.  Dr. Sangnil opined that Thompson would need to elevate her legs at will at 45 degrees.  Tr. 446.  Also, Thompson would require unscheduled rest periods during an 8-hour workday in addition to the standard breaks and lunch and she would require an additional 8 hours of rest on an average day.  Tr. 446.

     *Mental impairments*

In July 2016, Ms. Cardello and Howard Gottesman, M.D., completed a form entitled Medical Source Statement: Patient's Mental Capacity.  Tr. 689-690.  Dr. Gottesman signed the form on July 14, 2016, and Ms. Cardello signed the form on July 25, 2016.  Tr. 690.  They noted that Thompson had been under their care since November 30, 2015.  Tr. 690.

Ms. Cardello and Dr. Gottesman opined that Thompson could constantly, meaning her ability to perform the activities was unlimited, understand, remember and carry out simple job instructions; maintain appearance; and leave her own home.  Tr. 689-690.  They opined that Thompson could frequently, meaning she had the ability to perform the activities for up to 2/3 of a workday, follow work rules; respond appropriately to changes in routine settings; interact with

supervisors; work in coordination with or proximity to others without being distracted; work in coordination with or proximity to others without being distracting; understand, remember and carry out detailed, not complex job instructions; socialize; behave in an emotionally stable manner; and relate predictably in social situations. Tr. 689-690. They opined that Thompson could occasionally, meaning she had the ability to perform the activities for up to 1/3 of a workday, use judgment; maintain attention and concentration for extended periods of 2 hour segments; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to coworkers; function independently without redirection; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember and carry out complex job instructions. Tr. 689-690.

When asked to identify diagnosis and symptoms that supported the assessment, Ms. Cardello and Dr. Gottesman indicated that Thompson was easily overwhelmed; she "flips out" when upset; she was depressed due to chronic pain; she had poor self-esteem; her sleep was disturbed; and she had past suicidal thoughts. Tr. 690.

### b. Reviewing

_Physical impairments_

On November 22, 2014, state agency reviewing physician Abraham Mikalov, M.D., completed a Physical RFC Assessment. Tr. 93-95. Dr. Mikalov opined that Thompson could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday and push and/or pull unlimitedly, other than as noted for lift and/or carry. Tr. 93-94. In explaining the exertional limitations, Dr. Mikalov noted that Thompson had mild to

moderate degenerative disc disease, a BMI of 42.55, a normal gait and that Thompson's range of motion was within normal limits. Tr. 94. With respect to postural limitations, Dr. Mikalov opined that Thompson could never climb ladders/ropes/scaffolds; should could occasionally climb ramps/stairs; and she could frequently stoop. Tr. 94. Dr. Mikalov also opined that Thompson would have to avoid concentrated exposure to vibration and avoid all exposure to unprotected heights and machinery that involved climbing. Tr. 94-95.

Upon reconsideration, on April 28, 2015, state agency reviewing physician Stephen Sutherland, M.D., reached the same conclusions as Dr. Mialov regarding Thompson's Physical RFC Assessment. Tr. 104-106.

*Mental impairments*

On December 3, 2014, state agency reviewer Fred Greaves, Ed.D., completed a Psychiatric Review Technique ("PRT"). Tr. 91-92. He opined that Thompson had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence or pace. Tr. 92. He also indicated that Thompson had no repeated episodes of decompensation, each of an extended duration. Tr. 92. Dr. Greaves explained his PRT findings, stating that

> [Claimant] currently takes care of her 7 year old daughter, they live independently; she is able to cook meals for her, pick her up from school daily. She visits with friends and family a few times a month and occasionally goes to church. She has attempted to take continuing education classes. She has not been hospitalized. She does attend counseling sessions.
>
> Her psychological impairments are not severe at this time and would not [a]ffect her ability in a working environment. Tr. 92.

Upon reconsideration, on April 27, 2015, state agency reviewer Karla Voyten, Ph.D., completed a PRT. Tr. 102-103. Dr. Voyten reached the same opinions as Dr. Greaves. Tr. 91-92, 102-103.

**C.     Testimonial evidence**

**1.     Plaintiff's testimony**

Thompson was represented at and testified at the hearing.  Tr. 48-76.

Thompson discussed her physical and mental problems.  She explained that her back is the main reason she is unable to work on a full-time basis.  Tr. 61.  Her back hurts when she is performing daily activities such as cleaning and, if she pushes it too much, her back will really start to act up.  Tr. 61.  There are times when she walks into a room and the pain hits her so hard in the back and runs down her leg that it makes her collapse.  Tr. 61-62.  Her back pain is in the low back and worse on the right, which Thompson attributes to the manner in which she lifted patients.  Tr. 62-63.  There is no comfortable position for Thompson but, if she is in bed lying on her side, she will prop a pillow under her knees and prop a pillow behind her so she can ease up off her side.  Tr. 73.  She spends most of her day in her bedroom in bed.  Tr. 73.

Thompson previously received injections in her back.  Tr. 63.  She would have about two weeks of relief following an injection but then her pain would come back.  Tr. 63.  Her last injections were about a year prior to the hearing.  Tr. 63.  She no longer receives injections because there was not enough benefit from them.  Tr. 70.  Thompson is unable to take narcotic pain medication because she is allergic to them.[10]  Tr. 63.  She is able to take prescription Ibuprofen and sometimes takes it three times per day.  Tr. 64.  Thompson is not participating in a physical therapy program but she started to try to walk to help ease her pain some.  Tr. 64.  Her doctor had talked about getting her a TENS unit but she never received one.  Tr. 64.  She has tried heat and cold compresses to relieve her pain but it does not help.  Tr. 65.  Also, her

---

[10] Thompson indicated she was allergic to the following medications – Vicodin, Oxycontin, Penicillin, Codeine, Darvocet, Percocet, Morphine, Fentanyl.  Tr. 64, 70.

daughter or boyfriend have tried massaging her back to try to help relieve the pain. Tr. 65. Thompson is not a candidate for surgery. Tr. 70.

As far as her mental health issues, Thompson has a case manager and counselor at Centers for Families and Children and she was recently affiliated with Lakewood Area Family Collaborative. Tr. 65. She was seeing a doctor at Metro Health Hospital for medication management. Tr. 65. She was taking Effexor ER and felt that it helped a lot. Tr. 65-66. The medication helped calm down the voices, hallucinations, and anxieties. Tr. 65. Thompson still suffers from depression. Tr. 71. She has good days and bad days. Tr. 71. She has bouts of anger and rage over nothing and says things that she then feels guilty about. Tr. 71-72. She has had "mobile crisis" called on her in the past, with the most recent incident occurring in May 2016, a few months before the hearing. Tr. 72. Thompson feels that there is some correlation between pain flare ups and increases in her depression, anger and/or anxiety. Tr. 72. When her back hurts, she feels worthless and unable to contribute while others around her are being productive. Tr. 72.

Thompson performs various chores around the house, including washing, cooking, cleaning, etc. Tr. 49-50. She does some yard work herself but has some help from her brother and son with the yard work. Tr. 49, 50. She also has help taking out the trash because the garbage cans are big. Tr. 50. Thompson drives and does her own grocery shopping but she needs someone to help with getting the groceries out of her car. Tr. 50. Thompson listens to music, watches television and uses a computer for email, games, and social media sites. Tr. 52-53. She tries to walk for exercise. Tr. 53. She walks slowly. Tr. 53. She has tried walking from her house to the corner and sometimes to the store. Tr. 53. When her back pain causes shooting pain down her leg and is so severe that it causes her to fall, she is unable to do things

for about a week. Tr. 69. Thompson estimated having episodes of this severity about once a week, every other month. Tr. 69-70. During these episodes, Thompson's brother, son, or boyfriend assist with her daily activities. Tr. 69, 75-76.

Thompson estimated being able to walk for about 20-30 minutes before needing to sit and rest. Tr. 74. She can sit for about an hour before needing to get up or lie down but she usually puts more pressure on her left side in order to take pressure off of her right side. Tr. 74. She can stand for about 20 minutes at a time. Tr. 74-75. Thompson estimated being able to carry a gallon of milk or eight pounds, not constantly throughout the day, but on and off throughout an 8-hour workday for about two hours. Tr. 75.

Thompson's son lives around the corner from her and she sees him daily and her son and daughter are close. Tr. 50-51. Thompson served 30 days in jail for a probation violation that stemmed from not making required payments. Tr. 51. While she was in jail, her son cared for her daughter. Tr. 51. Thompson is a member of a church but she had not attended services since her mother passed away two months earlier. Tr. 51, 53. Thompson stays in touch with friends that she went to school with. Tr. 53. She sees them on weekends – sometimes they go to a park or the movies and sometimes they will visit at one of her friend's houses. Tr. 53-54. There are times when Thompson shuts people out because of her pain or depression. Tr. 73. As far as hobbies, Thompson likes to crochet. Tr. 55-56.

Thompson described a typical day for her. Tr. 54. She wakes around 6:40 a.m. and she gets her daughter up for school. Tr. 54. Thompson's daughter will get Thompson's medication for her. 54. If Thompson gets up too fast without taking her medication, she gets really dizzy. Tr. 54. Thompson waits for her daughter to get herself ready for school and then Thompson's son takes her daughter to school. Tr. 54. After her daughter leaves for school, Thompson

sometimes lies back down if she is hurting or she will clean a room or walk around. Tr. 54. She will talk on the phone. Tr. 55. She will talk to some of her neighbors or her son. Tr. 55. Her son may ask her to babysit her grandchildren, ages 1, 2, and 3 (and there was a new baby on the way). Tr. 55. Thompson indicated that her son's girlfriend's children also call her grandma. Tr. 55.

### 2. Vocational Expert

Vocational Expert ("VE") Ted Macy testified at the hearing. Tr. 76-86. The VE described Thompson's past work for the prior 15 years, indicating that she worked as a home health attendant, a semi-skilled, medium level job as described in the DOT, but performed by Thompson at the medium-heavy level. Tr. 77-78. The VE explained that Thompson also worked as a nursing assistant, a semi-skilled, medium level job as described in the DOT and as generally performed by Thompson. Tr. 78.

The ALJ then asked the VE a series of hypotheticals. First, the ALJ asked the VE to consider an individual the same age and with the same education and past work experience as Thompson who is able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push and/or pull unlimitedly except as indicated for lift and/or carry; can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently stoop; and must avoid concentrated exposure to vibration and avoid all exposure to hazards. Tr. 78-79. The VE indicated that the described individual would be unable to perform Thompson's past work. Tr. 79. However, there would be unskilled, light level jobs available for the described individual, including wire worker, electronics worker, and assembly press operator. Tr. 79-80. The VE provided national job incidence data for each of the identified jobs. Tr. 79-80.

The ALJ asked the VE to consider the first hypothetical with the following additional limitations – the individual can perform work with no fast pace or high production quotas with infrequent change and can perform low-stress work, meaning no arbitration, responsibility for safety of others, and/or supervisory responsibility. Tr. 80. The VE indicated that none of the additional limitations would change his prior answer. Tr. 80.

The ALJ then added a further limitation, i.e., the individual can have superficial interaction with others, meaning of a short duration for a specific purpose, and asked the VE whether the described individual would be able to the perform the jobs previously identified by the VE. Tr. 80. The VE indicated that the same jobs, with the same numbers, would still apply. Tr. 81.

The ALJ added another limitation, i.e., the individual might be absent from work two or more days per month due to issues with chronic pain, and asked the VE whether the described individual would be able to perform the jobs previously identified by the VE. Tr. 81. The VE indicated that missing two days per month on an ongoing basis would be unacceptable. Tr. 81.

The ALJ then started with a new hypothetical, asking the VE to consider an individual the same age and with the same education and past work experience as Thompson who is able to occasionally lift and carry 10 pounds, frequently lift and carry 5 pounds, stand and walk for 2 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push and/or pull unlimitedly except as indicated for lift and/or carry; can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch and crawl; and must avoid concentrated exposure to vibration and avoid all exposure to hazards, meaning unprotected heights and hazardous machinery. Tr. 81-82. The VE indicated that the described individual would be unable to perform Thompson's past work. Tr. 82. However, the VE

indicated that there would be unskilled, sedentary jobs available, including table worker, final assembler, and bonder.  Tr. 82.  The VE provided national job incidence data for the jobs identified.  Tr. 82.

The ALJ then added other limitations to the hypothetical, i.e., the individual can perform work with no fast pace or high production quotas with infrequent change and can perform low-stress work, meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility, and asked the VE whether the described individual would be able to perform the sedentary jobs previously identified by the VE.  Tr. 83.  The VE indicated that the additional limitations would not change his answer – the same jobs, with the same numbers, would remain.  Tr. 83.

The ALJ then added a further limitation, i.e., the individual can have superficial interaction with others, meaning of a short duration for a specific purpose, and asked the VE whether the described individual would be able to the perform the sedentary jobs previously identified by the VE.  Tr. 83.  The VE indicated that the same jobs, with the same numbers, would still apply.  Tr.  83.

The ALJ added another limitation, i.e., the individual might be absent from work two or more days per month due to issues with chronic pain, and asked the VE whether the described individual would be able to perform the jobs previously identified by the VE.  Tr. 83.  The VE indicated that, in a competitive setting, with no accommodations being provided, missing two or more days per month would result in there being no jobs available.  Tr. 83.

Thompson's counsel asked the VE to consider the ALJ's first hypothetical with the additional limitation of being limited to less than occasional reaching, pushing and pulling and asked whether that additional limitation would change the jobs identified.  Tr. 84.  The VE

indicated that that additional limitation would be a problem for any of the jobs identified during the hearing, resulting in there being no jobs available.  Tr. 85.  Next, Thompson's counsel asked the VE to again consider the ALJ's first hypothetical with the additional limitation of requiring the ability to alternate positions between sitting, standing and walking at will and asked the VE what impact the additional limitation would have on the number of jobs identified.  Tr. 85.  The VE indicated that the sedentary positions that he identified would remain available, provided that the individual needed only a few seconds to change positions.  Tr. 85-86.  If the individual needed to walk around and leave her work station, it would likely result in elimination of the sedentary jobs.  Tr. 86.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her October 17, 2016, decision, the ALJ made the following findings:[13]

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[13] The ALJ's findings are summarized.

1.  Thompson meets the insured status requirements through December 31, 2017. Tr. 19.

2.  Thompson has not engaged in substantial gainful activity since March 10, 2012, the alleged onset date. Tr. 19.

3.  Thompson has the following severe impairments: degenerative disc disease (lumbar), obesity, affective disorder (depression/dysthymic disorder), and substance addiction disorder (cannabis abuse). Tr. 19.

4.  Thompson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 20-22.

5.  Thompson has the RFC to perform sedentary work, as she is able to occasionally lift and carry 10 pounds and frequently lift and carry 5 pounds, is able to stand and walk for 2 hours of an 8-hour workday, and is able to sit for 6 hours of an 8-hour workday, with unlimited ability to push and pull other than shown for lift and/or carry; she can occasionally climb ramps and stairs, and never climb ladders, ropes or scaffolds; she can occasionally stoop, kneel, crouch and crawl; she must avoid concentrated exposure to vibration and avoid all exposure to hazards, such as unprotected heights and machinery which involve climbing; she can perform work with no fast pace or high production quotas and with infrequent change; she can perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility; and she can have superficial interaction with others, meaning of a short duration for a specific purpose. Tr. 22-34.

6.  Thompson is unable to perform any past relevant work. Tr. 34.

7.  Thompson was born in 1973 and was 39 years old, defined as a younger individual age 18-44, on the alleged disability onset date. Tr. 34.

8.  Thompson has a limited education and is able to communicate in English. Tr. 34.

9.  Transferability of job skills is not material to the determination of disability. Tr. 34.

10. Considering Thompson's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Thompson can perform, including table worker, final assembler, and bonder. Tr. 34-35.

Based on the foregoing, the ALJ determined that Thompson was not under a disability, as defined in the Social Security Act, from March 10, 2012, through the date of the decision. Tr. 35.

## V. Plaintiff's Arguments

Thompson's two arguments in this appeal are interrelated. First, she argues that the ALJ failed to assign appropriate weight to the medical opinion of her treating physician Dr. Sangnil who offered opinions regarding Thompson's physical limitations and failed to assign appropriate weight to the opinion Dr. Gottesman and Carol Cardello who offered opinions regarding her mental capacity. Second, she contends that the ALJ's RFC is not supported by substantial evidence because the ALJ did not specifically address the reaching, pulling and pushing limitations contained in Dr. Sangnil's opinion.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.** **The ALJ properly considered and weighed the medical opinions of Thompson's treating sources and the RFC is supported by substantial evidence**

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v.*

*Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

### *Dr. Sangnil*

After discussing the details of Dr. Sangnil's November 18, 2015, opinion, the ALJ explained the weight she assigned to the opinion, stating:

> Although Dr. Sangral [sic][14] is a treating source, her opinion does not warrant controlling or even great weight. In so finding, the undersigned notes that Dr. Sangral has provided limited medical treatment, as the record contains evidence of only two visits, both of which involved either a request for disability evaluation or completion of disability paperwork (Exhibit 5F/ 46-50, 21-25). Furthermore, while examinations conducted by Dr. Sangral yielded some significant physical abnormalities, such as very limited lumbar range of motion, lower extremity weakness, a slow, antalgic gait, and inability to take more than three steps before needing to sit, these findings are in stark contrast to the remaining evidence of record (Id.). More specifically, while the remaining evidence of record indicates chronic lumbar tenderness and decreased lower extremity reflexes, examinations have revealed full strength, normal sensation and coordination, and a normal gait with independent ambulation (Exhibit 2F, 3F, 4F, 5F). Furthermore, the opinion, including the need for breaks for 8 hours a day, is inconsistent with the claimant's more extensive activities of daily living, which include washing clothes, cooking, cleaning, taking out the trash, shopping for groceries, driving, going to the library, crocheting, babysitting her young grandchildren, spending time with friends, and playing computer games (Hearing Testimony). As a result, the undersigned gives Dr. Sangral's opinions some, but not great or controlling weight.

Tr. 33.

Thompson contends that the ALJ never determined if Dr. Sangnil was a treating source. This argument is without merit. As is clear in the ALJ's decision, the ALJ attributed treating source status to Dr. Sangnil. Tr. 33 ("Although Dr. Sangnil is a treating source, her opinion does not warrant controlling weight . . .).

---

[14] In the treatment notes the spelling of the doctor's name is "Sangnil." *See, e.g.*, Tr. 391.

Thompson also argues that the ALJ erred in not assigning controlling weight to Dr. Sangnil's opinion because it is consistent with other evidence of record, including Dr. Sangnil's examination findings, a prior medicine and rehabilitation examination performed in 2013, x-ray and MRI evidence, and her own subjective reports of pain. The ALJ did not ignore the evidence that Thompson points to. *See*, e.g., Tr. 23 (discussing 2/13/13 x-ray); Tr. 24 (discussing 9/23/13 PM&R examination); Tr. 26 (discussing 6/11/15 MRI). Rather, the ALJ considered Thompson's medical history in detail. Tr. 22-28. Further, Thompson acknowledges that the ALJ pointed to evidence showing full normal strength, normal sensation and coordination, and a normal gait and she does not dispute that these medical findings are supported by the record. Instead, she argues that the ALJ failed to recognize that, at every examination Thompson reported fluctuating pain, with periods of severe pain, and that those reports were consistent with her hearing testimony. However, the ALJ did not ignore Thompson's subjective complaints, including her claim that her pain fluctuated. *See* Tr. 23 (discussing Thompson's reports that she experiences week long periods of back pain during which she is unable to perform activities and requires assistance of others). Moreover, the ALJ considered Thompson's subjective complaints and provided detailed reasons for finding her subjective allegations not entirely credible or consistent with the evidence (Tr. 31-32) and Thompson does not raise a specific challenge to the ALJ's credibility assessment. She argues instead that ALJ improperly relied on her activities of daily living when finding Dr. Sangnil's opinion inconsistent with the record. She contends that the ability to perform some level of activity is not indicative of the ability to perform substantial gainful activity for 8 hours a day. Contrary to Thompson's suggestion, the ALJ did not find Thompson not disabled based solely on her activities of daily living. Furthermore, Thompson's activities of daily living, which included driving, shopping, spending time with friends, and babysitting her

young grandchildren, were not the only reason that the ALJ found Dr. Sangnil's completely disabling opinion not consistent with the record evidence. For example, the ALJ also found Dr. Sangnil's findings contrasted by various normal medical examination findings. Tr. 33.

Considering the foregoing, the Court finds that the ALJ's decision not to assign controlling weight to Dr. Sangnil's opinion is sufficiently explained and is supported by substantial evidence.

Thompson also argues that, after not assigning controlling weight to Dr. Sangnil's opinion, the ALJ failed to fully evaluate the factors under 20 C.F.R. § 404.1527. This argument also falls short. The ALJ need not provide a factor-by-factor analysis. Furthermore, the ALJ made clear that only some weight was provided to Dr. Sangnil's opinion because of its inconsistency with and lack of support from the record as whole, which are proper factors to consider. Additionally, the ALJ considered that Dr. Sangnil had provided limited treatment and saw Thompson only twice with those visits involving a request for disability evaluation and/or a request to complete disability paperwork. The length, nature and extent of the doctor-patient relationship is a proper factor to consider when weighing a medical opinion. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii). Also, as discussed above, the ALJ considered Thompson's activities of daily living and found that Dr. Sangnil's opinion, including the need for breaks for 8 hours each day, was not consistent with Thompson's reports of activities of daily living.

For the reasons set forth above, the Court finds no error with the ALJ's weighing of Dr. Sangnil's opinion.

Furthermore, Thompson's claim that the RFC is not supported by substantial evidence because the ALJ did not specifically address Dr. Sangnil's opinion regarding reaching, pushing and pulling limitations is without merit. The Regulations make clear that a claimant's RFC is an

issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c). An ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

Here, the ALJ assigned some, but not great or controlling weight. Tr. 33. As indicated above, the ALJ's decision to assign some, but not great or controlling weight is sufficiently explained and supported by substantial evidence. Thus, the fact that the ALJ did not adopt Dr. Sangnil's opinion verbatim is not grounds for reversal. Also, as reflected in the RFC assessment, the ALJ limited Thompson to occasionally pushing/pulling 10 pounds and frequently pushing/pulling 5 pounds, (Tr. 22 (". . . unlimited push and pull other than as shown for lift and/or carry.")), and the ALJ found no reaching limitations. In light of the foregoing, it is clear that the ALJ concluded that there was evidentiary support for some pushing/pulling limitations but no evidence to support limitations on reaching. Furthermore, other than arguing that Dr. Sangnil's opinion should be entitled to controlling weight, which as discussed above is not a basis for reversal or remand, Thompson does not identify other evidence supporting the need for limitations on reaching or greater pushing/pulling limitations.

For the reasons discussed above, the Court finds no basis to reverse and remand the case for further explanation regarding the pushing/pulling and reaching limitations contained in Dr. Sangnil's opinion.

*Dr. Gottesman and Ms. Cardello*

The ALJ discussed Thompson's medical records regarding her mental impairments and weighed the medical opinion evidence regarding said impairments. Tr. 28-31, 32, 33-34. In doing so, the ALJ explained the weight assigned to the opinion rendered by Dr. Gottesman and Ms. Cardello, stating:

> Treating sources Howard Gottesman, M.D., and Carol Cardello, CNS, opined in July 2016 that the claimant can frequently follow work rules, respond appropriately to changes in routine settings, interact with supervisors, work in coordination with or proximity to others without being distracted or being distracting, understand, remember, and carry out detailed, but not complex job instructions, socialize, behave in an emotionally stable manner, and relate predictably in social situations (Exhibit 9F). They opined the claimant can occasionally use judgment, maintain attention and concentration for extended periods of 2 hour segments, maintain regular attendance and be punctual, deal with the public, relate to coworkers, function independently without redirection, deal with work stress, complete a normal workday and workweek , and understand, remember, and carry out complex job instructions (Id.). In support of their opinion, Dr. Gottesman and Ms. Cardello noted depression due to chronic pain, poor self-esteem, sleep disturbance, and past suicidal thoughts, and they confirmed the claimant is easily overwhelmed and flips out when upset (Id.). The undersigned gives this opinion some weight, as it was based on treating relationships with the claimant and is generally consistent with the record as a whole, which supports findings of moderate limitation in social functioning and concentration, persistence, and pace, and a limitation to low stress work (Exhibit 1F, 2F, 3F, 4F, 5F, 8F). However, Ms. Cardello is not an acceptable medical source as defined by the Social Security Administration regulations, and even more significant, the record indicates that she has seen the claimant only twice (Exhibit 5F/ 13-16; 8F/1-3). Although Dr. Gottesman is a licensed psychiatrist, and therefore an acceptable medical source, the medical record is absent evidence that he provided treatment to the claimant (Exhibit 5F, 8F). Finally, the opinions are somewhat contradicted by the recent, largely unremarkable mental status examinations of the claimant, which confirm improvement with medication and treatment (Id.). For these reasons, the undersigned gives the opinion some, but not great or controlling weight.

Tr. 33-34.

Thompson claims that because the ALJ indicated that Dr. Gottesman and Ms. Cardello's opinion was "generally consistent with the record as whole," the ALJ should have provided great weight to the opinion, not some weight. However, in making this argument, Thompson appears

to disregard the fact that the ALJ's statement regarding the consistency of the opinion with the record was qualified. More specifically, the ALJ stated that the opinion was "generally consistent with the record as a whole, which supports findings of moderate limitation in social functioning and concentration, persistence, and pace, and a limitation to low stress work." Tr. 33 (emphasis supplied). Furthermore, the ALJ explained that the opinion was "somewhat contradicted by the recent, largely unremarkable mental status examinations of the claimant, which confirm improvement with medication and treatment[,]" (Tr. 33) and Thompson does not challenge this finding. The foregoing makes clear that the ALJ did not find the opinion entirely consistent with other substantial evidence in the record, thus, supporting her decision not to provide controlling weight to the opinion of Dr. Gottesman and Ms. Cardello.

Thompson claims that the ALJ erred by discounting the opinion on the basis that Ms. Cardello was not an acceptable medical source and because Dr. Gottesman did not examine Thompson. Thompson's argument is without merit. In discounting the opinion, the ALJ also took into account the limited treatment provided by Ms. Cardello. Tr. 33 (finding that the record reflected that Ms. Cardello saw Thompson only twice). Thompson does not contend that Ms. Cardello provided more extensive treatment. Moreover, it was appropriate for the ALJ to consider the lack of treatment by Dr. Gottesman and the limited treatment by Ms. Cardello when weighing the medical opinion. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii) (factors to consider when weighing medical opinions including the length of the treatment relationship, frequency of the examination, and nature and extent of the treatment relationship). Moreover, notwithstanding the lack of treatment relationship between Dr. Gottesman and Thompson, the ALJ provided a thorough analysis sufficient to satisfy the treating physician rule.

For the reasons set forth herein, the Court finds no error with the ALJ's weighing of the opinion rendered by Dr. Gottesman and Ms. Cardello.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: December 28, 2017

Kathleen B. Burke
United States Magistrate Judge